MILDRED BILSKY, Plaintiff and Counterdefendant, Appellant, *v.* HOWARD BILSKY, Defendant and Counterplaintiff, Appellee.

(No. 56679;

First District (4th Division)—March 13, 1974.

Dom J. Rizzi, of Chicago, for appellant.

No brief for appellee.

Mr. PRESIDING JUSTICE ADESKO delivered the opinion of the court:

Mildred Bilsky, plaintiff and counterdefendant, appellant (hereinafter counter defendant), filed a suit for separate maintenance or in the alternative for divorce against her husband, Howard Bilsky, defendant and counterplaintiff, appellee (hereinafter counter plaintiff), in which she alleged as grounds for divorce that Mr. Bilsky was guilty of adultery and mental cruelty. Mr. Bilsky filed a counterclaim for divorce in which he alleged as grounds for divorce physical and mental cruelty. At the trial Mrs. Bilsky did not proceed with her complaint but offered evidence in defense of the counterclaim of Mr. Bilsky. A bench trial was had solely on the counterclaim and the court found in favor of the counterplaintiff. In this appeal the counterdefendant maintains that the counterplaintiff failed to prove as a matter of law conduct amounting to extreme and repeated mental cruelty. It is also contended by the counterdefendant that the counterplaintiff failed as a matter of law to prove lack of provocation and that he failed to establish that the alleged acts of mental cruelty affected his physical or mental health. The counter defendant also contends that her defense of recrimination is a bar to the entry of the divorce decree in favor of the counterplaintiff. We find no merit in these contentions.

The parties were married on January 17, 1970, in Chicago Illinois, and the complaint of Mrs. Bilsky was filed on September 9, 1970. As stated previously, Mr. Bilsky filed a counterclaim for divorce and although it

alleged both physical and mental cruelty, no evidence of physical cruelty was introduced at the trial. The counter plaintiff testified that two weeks after the marriage he and Mrs. Bilsky went on a two-week honeymoon in Miami, Florida, which was financed entirely by Mrs. Bilsky. The counterplaintiff stated that he did not want to go on the honeymoon and that he did not have any funds as he was between jobs at the time. However, Mr. Bilsky did go and he testified that Mrs. Bilsky would dole out money to him for the cost of meals, including tips. He stated that Mrs. Bilsky would give him whatever the cost of the meal was and that this embarrassed him. Mr. Bilsky testified further that he did the shopping, prepared the meals, cleaned the apartment, did his own laundry and that the plaintiff retired each evening at 7 or 8 P.M. Mrs. Bilsky, according to the counterplaintiff, continuously accused him of drinking and being a drunk. She also accused Mr. Bilsky of carousing with other women because she found cigarette butts in his car with lipstick on them. However, Mr. Bilsky explained that some of these belonged to his mother and some to office girls in the shop where he worked. He testified he gave them rides to public transportation because the shop was located in a bad neighborhood. Mr. Bilsky also testified that Mrs. Bilsky interfered with his watching television by turning the volume down or by turning the set off. Mr. Bilsky stated that he lost 9 or 10 pounds during the period that the parties lived together.

On July 6, 1970, the counter plaintiff's 13-year-old son, by a prior marriage, came to live with the parties without the prior consent of Mrs. Bilsky. Mr. Bilsky testified that Mrs. Bilsky treated his son as an unwelcome guest but that she was concerned for his son's well-being and did not treat him badly. Mr. Bilsky testified that Mrs. Bilsky would not cook or clean for his son nor do his laundry. Mr. Bilsky stated, "It was— in other words, she was not his mother and she didn't want to act as his mother and she wouldn't do any of the matronly acts that belonged in a household."

During the course of the marriage, difficulties with sexual relations developed and the counterplaintiff accompanied his wife to see her gynecologist. The doctor did not testify but Mr. Bilsky was permitted to testify over objection that the doctor's conclusion was that Mrs. Bilsky had an obsession with money and that this was an obstruction to their sexual relations. Mr. Bilsky testified that during the marriage he went to see a doctor because of his mental distress and that he was an asthmatic and feared that mental distress would aggravate the problem.

On August 8, 1970, the counterplaintiff and his son moved from the marital residence into an apartment at 6727 N. California. Mr. Bilsky stated he moved for the sake of his sanity and that of his son. Accord-

ing to Mr. Bilsky, he could no longer stand the harassing and embarrassment and the accusations and the allegations that were thrown upon him by Mrs. Bilsky in front of his son.

The counterdefendant testified and her testimony was in direct conflict with that of Mr. Bilsky. Mrs. Bilsky stated she first learned the defendant was without funds on the day of the wedding and that he was unemployed until March 10, 1970. She testified that after Mr. Bilsky began working he never paid any of the bills and that she paid the rent and utilities. She also stated that she paid for the food and only after she begged Mr. Bilsky for money did he begin to give her $10 per week for expenses.

Mrs. Bilsky also testified that she did the cleaning and that the counterplaintiff would call her from one end of the apartment to the other to show her a spot she had missed. She stated that she did the cooking and that she treated the counterplaintiff's son well. Mrs. Bilsky explained that the visit to her gynecologist was intended to get Mr. Bilsky to assume his responsibilities. She stated she tried to please her husband in every way.

Mrs. Bilsky stated her husband began coming home late or not at all in May of 1970. She found lipstick and cigarettes not used by her in his car. She found the name of another woman in Mr. Bilsky's wallet which he refused to explain. She stated Mr. Bilsky was in an automobile accident on the Saturday after he left the marital residence and that a woman he was dating was a passenger.

The counterdefendant hired a detective and he testified that he had Mr. Bilsky's apartment at 6727 N. California under surveillance between February 12 and 16 of 1971. The detective stated he observed the counterplaintiff and a woman leaving and entering the apartment and spending the night there. The detective marked both entrances to the apartment and stated no one could have gone out the other entrance. He observed the woman drive an automobile with license number MB 5425, and through a license check determined that the woman was Irene Buyer. At the trial the detective identified Mr. Bilsky as the man he observed in the apartment. The detective stated he observed Mr. Bilsky and Irene Buyer walking hand in hand in a shopping center. Upon cross-examination the detective did state that during the time he had the apartment under surveillance he did not observe an act of sexual intercourse between Mr. Bilsky and Irene Buyer. The detective was also directed to check an address at 7133 N. Damen and he stated that the mailbox for apartment 8 at that address had the names Buyer and Bilsky on it. He also stated that the automobile with license number MB 5425 was parked at the rear of this apartment.

■■ The trial court found in favor of the counterplaintiff and the first issue raised by the counterdefendant in this appeal is that the counterplaintiff failed to prove extreme and repeated mental cruelty. This contention is predicated upon the assertion that more evidence than the complaining party's bare assertion that certain acts have caused mental cruelty is necessary. The counterdefendant admitted in her brief that no such rule has been articulated by an Illinois court but maintains that our courts have established and followed a policy of not allowing a divorce where the testimony of the complaining party was not corroborated by additional evidence on the issue of mental cruelty. In support of this position the counterdefendant cited *Stanard v. Stanard,* 108 Ill.App.2d 240, 247 N.E.2d 438 (1969), and *Howison v. Howison,* 128 Ill. App.2d 377, 262 N.E.2d 1 (1970). While it is true that in both cases the divorce was not permitted and that the only evidence as to mental cruelty was supplied by the complaining witness, the decisions are based on grounds other than that the testimony of the complaining witness was not corroborated. The law is directly contrary to the assertion of the counterdefendant and corroboration is not necessary in a contested divorce proceeding. (*Varap v. Varap,* 76 Ill.App.2d 402, 222 N.E. 2d 77 (1966).) The testimony of the complainant is enough if it is sufficiently credible in light of the opposing evidence to warrant acceptance by a reasonable person. (*Surratt v. Surratt,* 12 Ill.2d 21, 145 N.E.2d 594 (1957).) Although the *Varap* and *Surratt* decisions involved divorce actions based on physical cruelty, the rules enunciated in them are equally applicable to a divorce proceeding based on mental cruelty.

■■ The counterdefendant also maintains that the counterplaintiff failed to prove lack of provocation and that he did not establish that the alleged acts of mental cruelty affected his physical or mental health. It has been held that evidence as to lack of provocation is an essential element of a complaining party's case in a divorce proceeding based on mental cruelty. (*Stanard, supra.*) It has also been established that a complaining party must prove that the alleged acts of mental cruelty caused embarrassment, humiliation and anguish so as to render life miserable and unendurable or caused the plaintiff's life, person, or health to be endangered. (*Quilty v. Quilty,* 5 Ill.App.3d 801, 284 N.E.2d 690 (1972); *accord, Stanard, supra.*) As stated in *Howison, supra,* at 381: "What constitutes mental cruelty depends upon the total circumstances set forth in a given case. The conduct of a defendant may vary from case to case, but the ultimate test is the effect such conduct has upon the plaintiff and the marriage." The counterdefendant maintains that the counterplaintiff's proof failed in these essential elements. We do not agree.

■■ The instant controversy was tried before the court without a jury

and we must be mindful that the trial court was in a better position to determine the credibility of the witnesses. As stated in the divorce proceeding of *Hayes v. Hayes,* 117 Ill.App.2d 211, at 215, 254 N.E.2d 288, at 290 (1969):

> "It is within the province of the trial court to make the determination whether there has been sufficient evidence with which to establish either party's contentions. In the instant case the trial court heard the evidence, viewed the witnesses and was in a better position to conclude the issues. This court will not set aside the findings and judgment of the trial court unless the decision reached by such trial court is against the manifest weight of the evidence. *Hoffman v. Hoffman,* 40 Ill.2d 344, 239 N.E.2d 792 (1968); *Curran v. Curran,* 19 Ill.2d 164, 166 N.E.2d 13 (1960), and the trial court's findings are presumed to be correct. *Gillespie v. Gillespie,* 70 Ill. App.2d 38, 216 N.E.2d 462."

After carefully reviewing the record in the case at bar, we cannot conclude that the trial court's findings are against the manifest weight of the evidence.

██ The final issue raised by the counterdefendant is that her defense of recrimination precludes the entry of a divorce decree in favor of the counterplaintiff. The counterdefendant maintains that the testimony of the detective proved the counterplaintiff's adultery and that adultery is a good defense to any statutory ground for divorce. While we agree that adultery is a good defense to any statutory ground for divorce (*Stanard, supra*), it must be proved by a preponderance of the evidence. As stated in *Haring v. Haring,* 125 Ill.App.2d 116, at 121 to 122, 260 N.E.2d 396, at 399 (1970):

> "While we recognize that adultery seldom can be proved as a direct fact and that it may be established by circumstantial evidence (*Stiles v. Stiles,* 167 Ill. 576, 47 N.E. 867 (1897); *Marcy v. Marcy,* 400 Ill. 152, 79 N.E.2d 207 (1948)), we cannot say that the evidence in this case is such that the trial court erred in finding that the defense of adultery had not been proved by a preponderance of the evidence. '* * * to establish adultery by circumstantial evidence, the proofs must convince the mind affirmatively that actual adultery was committed, since nothing but the carnal act can lay the foundation for a divorce. * * *' *Fowler v. Fowler,* 315 Ill.App. 270, 42 N.E.2d 954, 957 (4th Dist. 1942). Likewise, in order to establish adultery, proof of the clearest and most convincing character must be offered that an actual carnal act of adultery was committed. *Metoyer v. Metoyer,* 92 Ill.App.2d 32, 235 N.E.2d 882 (1st Dist. 1968) (abst.)."

Similarly in the case at bar, we cannot conclude that the trial court erred in finding that the defense of adultery had not been proved by a preponderance of the evidence.

■■ We are cognizant of the well-established rules that a marriage should not be lightly terminated and that a complaining party must prove his case by competent evidence using a statutory ground as a basis. (*Farnbach v. Farnbach*, 1 Ill.App.3d 74, 273 N.E.2d 12 (1971); *Stanard, supra.*) However, in the case at bar the counterplaintiff sustained his burden of proof and the trial court did not err in entering a divorce decree in his favor. Therefore, the judgment of the Circuit Court of Cook County is affirmed.

Judgment affirmed.

BURMAN and DIERINGER, JJ., concur.